1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                                    DISTRICT OF NEVADA

8

9   DOUGLAS CODER & LINDA CODER
    FAMILY LLLP,
10
                                                   Case No. 3:19-CV-00520-RCJ-CLB
11              Plaintiff,

12   v.                                                          ORDER

13   RNO EXHIBITIONS, LLC *et al*.,

14              Defendants.

15

16          Following the trial held February 6-7, 2023, the Court entered findings of fact and

17   conclusions of law on the record. Those findings of fact and conclusions of law are incorporated

18   in this Order. The following findings of fact and conclusions of law supplement and memorialize

19   the findings of fact and conclusions of law that the Court made at the conclusion of trial.

20                                       FINDINGS OF FACT

21          The Court makes the following findings of fact:

22   **A. RNO's Funding Strategy**

23          RNO Exhibitions is a Nevada Limited Liability Company ("RNO") that Vincent Webb

24   ("Webb") formed in late 2013. Webb self-funded RNO through another one of his ventures,

Hellgate Ranch LLC ("Hellgate")[1], and he acted as the president, manager, organizer, and registered agent for RNO. Shortly after Webb formed RNO, the company started soliciting "short term" "bridge loan[s]" and provided potential lenders with one of several template emails drafted in November 2014, February 2015, and June 2015 (collectively, the "Template Emails"). The Template Emails stated:

> As discussed, I have a Very Unique Business that is seeking a short term funds. The bridge loan is Over Secured, Interest Bearing with an Equity Kicker that could easily be a multiplier of the money paid back.

*See* Ex. 12.

> As discussed, I have a Very Unique Business that is seeking a short term loan, which is now 80% funded. The bridge loan sought is Over Secured, Interest Bearing (7%) with payments every 6 months and an Equity Kicker that could easily be a multiplier of the money paid back for consideration of the loan.

*See* Ex. 11.

> As discussed, I have a Very Unique Business that is seeking a short term funds. The bridge loan is 100% guaranteed, Interest Bearing with an Equity Kicker that could easily be a multiplier of the money paid back.

*See* Ex. 14.

The Template Emails further urged potential lenders that "the time line I have to work with is short, so if you're interested to know more, please let me know when you have a few minutes so that I can fill in the blanks!" *Id*. Webb drafted these emails, and his signature was at the bottom of these emails. *Id*.

RNO also developed a business plan to solicit loans from potential lenders. The business plan represented to lenders that the forecasted net revenue for RNO for 2014 would total $4,965,250, increase to $9,057,167 by 2015, but would hit $7,698,592 in the worst case scenario.

---

[1] Webb funded RNO with a $600,000 loan from Hellgate.

Ex 7 at Coder_00036. However, RNO did not make any money in 2014, despite the projection. Webb also created a PowerPoint presentation to present to lenders. The PowerPoint showed a worst-case 2015 projection of $8.3 million in revenue. Ex. 13 at Coder_00076. But, RNO did not make any money in 2015. In fact, RNO lost money in 2015, so both the business plan and the PowerPoint contained factually incorrect information.

**B. Webb Seeks Help From The Coders**

While RNO sought funding, Douglas Coder and Scott Coder (collectively "Plaintiff") were approached by a friend regarding working with Webb to help secure loans for RNO. Since Douglas Coder was retiring and was having health issues, Scott Coder became the primary contact for Webb. Webb presented the PowerPoint with the revenue projections to both Scott Coder and Douglas Coder to get the Coders to help solicit loans for RNO. The Coders shared an interest in RNO, but they wanted to discuss whether the loans were guaranteed. Webb assured the Coders that the loans were guaranteed by RNO's accounts receivable as well as a UCC-1 asset filing on all RNO's assets. This guarantee persuaded the Coders to work with Webb to get funds for RNO.

However, Webb also spoke with Scott Coder individually to work as a consultant to Webb and RNO to find prospective lenders for the endeavor. Webb convinced Scott Coder to work as a consultant and solicit loans on RNO's behalf with the accounts receivable guarantee, the Template Emails, the business plan, and the PowerPoint. Subsequently, Webb provided Scott Coder with the Template Emails, the business plan, and the PowerPoint to use in soliciting people to make loans to RNO. The Court made an express finding that Webb and Scott Coder created a principal-agent relationship, with Webb acting as the principal and Scott Coder acting as the agent. Webb gave Scott Coder the express authority to send the Template Emails, the business plan, and the PowerPoint to prospective lenders.

Scott Coder sent these documents to prospective lenders, at Webb's request, and he solicited money. Scott Coder was able to convince some lenders to give RNO funds. At this time, Scott Coder did not know that the business plan and the PowerPoint were inaccurate because RNO had not lost money yet, nor had Webb revealed its weak financial condition.

**C. Webb Makes False Statements To Get Funds From The Coders**

In the beginning of 2015, Webb informed Scott Coder that RNO had secured a "huge deal" with Reed Exhibitions. This deal was not what it seemed because RNO was actually required to pay Reed Exhibitions, instead of receiving money from Reed Exhibitions. Webb did not tell Scott Coder that RNO would pay money to Reed Exhibitions. Webb also told Scott Coder that RNO had signed "MFG's" across the country to sell hundreds of products at an auction event and that RNO had millions of dollars of merchandise under contract to sell at the auction. Ex. 10. However, RNO lost money at the auction and had gross sales under $1,000,000 while projecting some $9,000,000 in sales. Webb did not inform Scott Coder of the loss or the smaller-than-expected sales. The Court made the express finding that Webb made these false statements to Scott Coder with the knowledge that they were false. Also, the Court made the express finding that Webb made these statements to induce Scott Coder to believe that RNO was profitable.

Further, Webb communicated to Scott Coder that RNO was cash-flowing and had millions of dollars of merchandise under contract, but neither of these statements were true. Ex. 10. Scott Coder received all this information from Webb and conveyed the information to RNO's lenders and potential lenders. On January 28, RNO filed its tax returns for 2015, showing a $771,940 loss. Ex 42. Webb knew at this point in time, with the IRS filing in mind, that the PowerPoint and the business plan were grossly inaccurate, but Webb did not inform Scott Coder of this information. The Court made the express finding that Webb knowingly omitted the information necessary to make Scott Coder aware that the PowerPoint and business plan were factually inaccurate.

Webb's statements convinced Scott Coder to make a loan to RNO for $100,000, which Webb stated was guaranteed by a UCC-1 filing of assets.  There was no filing of a UCC-1. Scott Coder did not know this, but Webb did. The Court made the express finding that Webb knowingly made a false statement as to the filing of a UCC-1 to guarantee the loan. Webb made this false statement to induce Scott Coder to make the loan. With the correct information, Scott Coder would not have loaned money to RNO.

**D.  The Funds Webb Received From The Coders**

On or about November 5, 2015, Webb signed a Term Sheet and 2-Year Promissory Note on behalf of RNO memorializing a $280,000 loan made by the Coder Family LLLP to RNO. Ex. 1. The Term Sheet identifies that the loan amount was for a total of $280,000 to be paid to RNO in three separate payments: $50,000, $30,000, and $200,000. The Coder Family LLLP made these payments on August 3, 2015, September 11, 2015, and November 5, 2015, respectively. The Promissory Note confirmed the details of the Term Sheet and provided further details for the loan. Ex. 1. The Promissory Note specifies that it is made by RNO "in favor of Douglas Coder & Linda Coder Family LLP." *Id*. It further states: "the entire balance and all accrued and unpaid interest is due two years from receipt of each amount received and deposited." *Id*. RNO was to pay interest on the loan semi-annually (July 1 and December 31) and it accrued "at an annual rate of seven percent," a default increased the annual interest to twelve percent. *Id*. at Section 3.

The Promissory Note further provides that the loans are "guaranteed and secured by: The ongoing accounts receivable of Seller Agreements for the Outdoor Supply Auction & Expo pledged by Maker to all Holders of two (2) year convertible notes under the Term Sheet herein." *Id*. at Section 5. The Term Sheet portion of the note further states that the loan is secured by both the Promissory Note and a "UCC-1 Filing on All Assets." Ex. 1. Webb knew that the loans were not over-secured and that no UCC-1 Filing of Assets had been made. Webb also knew that RNO

did not have any assets. The only asset which RNO used that was worth anything was the technology and intellectual property that the company used, even though it was never valued, and Webb owned and still owns them personally.

Webb knew RNO's accounts receivables were insufficient to guarantee the loans. RNO worked one auction and made no money on the auction. RNO did not arrange to work at any other auctions. RNO had no opportunity to make the accounts receivable worth anything of value. Webb did not inform the Coder Family or Scott Coder of the tax return, RNO's loss of money, or the absence of accounts receivables.

**E.  Webb Fails To Pay**

RNO made the first two interest payments pursuant to the loan agreement (December 31, 2015 and June 30, 2016), totaling $20,173.91. No other payments were made to the Coder Family as repayment or interest for the loan.

**F.  Attorney's Fees**

The loan contract and promissory note provide for attorney's fees, which must be added to the judgment. Plaintiff requested attorney's fees in the amount of $197,926.16 for which Webb is also liable pursuant to alter ego.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law:

**A.  Intentional Misrepresentation**

Webb intentionally misrepresented facts regarding RNO to the Coder Family. Under Nevada law, a claim for intentional misrepresentation requires a showing that the defendant "(1) made a false representation, (2) knowing (or that he should have known) was false or without sufficient foundation, and (3) with the intent to induce the plaintiff to rely on the claim to take or refuse to take some action." *Id.* The plaintiff must also establish that they justifiably relied on the

misrepresentation. *Blanchard v. Blanchard*, 108 Nev. 908, 911, 839 P.2d 1320, 1322 (1992).

Webb made false representations regarding RNO's financial condition, RNO's projected success, RNO's assets, and the guarantee on the loans that the Coder Family and Scott Coder provided. RNO, through Webb, presented to its prospective lenders, including the Coder Family and Scott Coder, that RNO's projected earnings for 2015 would be upwards of $7-8 million dollars. RNO was not making any money. This is evidenced by RNO's 2015 tax return showing a loss of $771,940.

Webb also made false representations regarding the over-secured and guaranteed nature of the loans that Webb solicited from prospective lenders and actual lenders, including the Coder Family and Scott Coder loans. The loans were supposedly secured by RNO's accounts receivables and a UCC-1 filing. In actuality, no UCC-1 filing was ever made and RNO had no accounts receivables to speak of as of the date the loans were entered into. The reality of RNO's financial condition, its lack of assets, and its lack of accounts receivable were never conveyed to either the Coder Family or Scott Coder. Instead, Webb made these representations to entice lenders, including the Coder Family, to loan money to RNO on the pretext that the loan would be short-term and was secured by RNO's assets. Neither was the case.

Moreover, Webb's argument at trial that he did not know that the Coder Family wanted a UCC-1 on the assets is an illogical argument. Not only did Webb know about the Coder Family, but it was not the Coder Family's responsibility to get a UCC-1 filing on the goods. Webb, the owner of the goods, needed to sign the UCC-1 to make it effective.

Webb contends that the Coder Family and Scott Coder should have known RNO had no assets given that it was seeking loans, thus failing to establish justifiable reliance because the Coder Family and Scott Coder did not perform due diligence. Such is not the standard in Nevada.

The principle of justifiable reliance "does not impose a duty to investigate absent any facts

to alert the defrauded party his reliance is unreasonable." *Collins v. Burns*, 103 Nev. 394, 397, 741 P.2d 819, 821 (1987). "A contracting party has a right to rely on an express statement of existing fact, the truth of which is known to the party making the representation and unknown to the other party. The recipient of the statement is under no obligation to investigate and verify the statement." *Id*; *see also Villalon v. Bowen*, 70 Nev. 456, 467–68, 273 P.2d 409, 414–15 (1954) ("a deliberate failure to correct an apparent misapprehension or delusion may constitute fraud. This would appear to be particularly so where the false impression deliberately has been created by the party sought to be charged.")

Here, there are no facts presented that should have alerted the Coder Family or Scott Coder that each of Webb's representations about RNO was false. The Coder Family was under no obligation to verify the facts conveyed to it by RNO. Webb further contends he personally did not convey any information to the Coder Family regarding RNO or entice the Coder Family to make the Loan. Yet, the testimony at trial showed Webb hired Scott Coder to elicit lenders for RNO with the information provided to him by Webb, making Scott Coder RNO's agent. "To bind a principal, an agent must have actual authority, express or implied, or apparent authority." *Dixon v. Thatcher*, 103 Nev. 414, 417, 742 P.2d 1029, 1031 (1987). Thus, Webb both directly made misrepresentations to the Coder Family and indirectly made them through RNO's agent.

The Court rules in favor of the Coder Family on the claim of intentional misrepresentation against Webb.

## B. Alter Ego

Webb is RNO's alter ego. Under Nevada law, "[a] person acts as the alter ego of a corporation only if: (a) [t]he corporation is influenced and governed by the person; (b) [t]here is such unity of interest and ownership that the corporation and the person are inseparable from each other; and (c) [a]dherence to the notion of the corporation being an entity separate from the person

would sanction fraud or promote a manifest injustice." NRS § 78.747. There is "no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1241–42 (D. Nev. 2008). (citation omitted).

Factors which could indicate "the existence of an alter ego include: '(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." *Beta Soft Sys., Inc. v. Yosemite Group*, LLC, 2:16-cv-01748-GMN-VCF, 2017 WL 3707393, at *3 (D. Nev. Aug. 25, 2017) (quoting *Truck Ins. Exch. v. Palmer J. Swanson*, Inc., 189 P.3d 656, 660 (Nev. 2008)). But, "[t]he individual circumstances and interests of justice control." *Brown*, 531 F. Supp. 2d at 1242 (citation omitted). It is sufficient for a finding of alter ego "to show recognizing the separate corporate existence would bring about an inequitable result." *Id*. And "undercapitalization, where it is clearly shown, is an important factor in determining whether the doctrine of alter ego should be applied." *North Arlington Med. v. Sanchez Constr*., 86 Nev. 515, 522, 471 P.2d 240, 244 (1970). Combined with a finding of "fraud or injustice to the aggrieved party," undercapitalization is an absolute ground for disregarding a corporate entity. *Id*.

Here, it is clear that Webb is RNO's alter ego. Webb is the only face of RNO. He sent all the emails, he was responsible for all the corporate filings, and he represented to the world that he, alone, was RNO. Clearly, there was a unity of interest between Webb and RNO. Further, the evidence showed that RNO was undercapitalized. RNO had no assets and no capital. Moreover, Webb filed trademarks on RNO's technology and never created a formal agreement to transfer the trademarks back to RNO. The lack of an agreement to transfer these trademarks back is a failure to observe corporate formalities. But, Webb also did not present corporate bylaws, minutes of meetings, or any evidence that a real corporate form existed beyond Webb's control over the

company. Additionally, Webb was the sole owner of RNO. While he represents that he did not have any ownership in the company, the evidence at trial showed that he accounted for RNO as an asset in Hellgate's IRS filings. The payment that he made was also evidence of comingling of funds because he made the loan to RNO from his own venture, Hellgate, and repaid the same to Hellgate. Finally, the facts presented at trial also show that Webb was the sole actor in control of RNO and made all the decisions for the company.

Given these facts, the Court rules in favor of the Coder Family on the claim of alter ego against Webb.

**C. Breach of Contract**

This Court has previously ruled against RNO for breach of contract. (ECF No. 94 at p. 5). Given the Court's ruling on alter ego, the Court determines that Webb is also liable on the breach of contract claim.

**D. Damages**

The Coder Family is entitled to damages, pursuant to its intentional misrepresentation claim against Webb. The principal damages pursuant to the Promissory Note that are due by RNO, as the breach of contract claim has already been determined; it is $280,000.00—the amount loaned to RNO, and $203,260.00 in interest (calculated through February 6, 2023, at 12% default from July 2017) for a total of $483,260.00, in addition to attorney's fees of $197,926.16 and post-judgment interest at 12%, recoverable against either RNO and/or Vincent Webb as its alter ego. These damages are subsumed by the damages for breach of contract recoverable against Webb.

Additionally, the Court found at the conclusion of trial that the Coder Family is entitled to punitive damages because Webb acted with malice. Webb was extensively involved in a pattern of making false representations to the Coder Family and other lenders to induce them into believing that RNO was profitable to get the Coder Family to loan money to RNO. The Court found that

Webb engaged in this pattern with malice, thereby making punitive damages necessary. However, the Coder Family did not make a showing at trial for an amount of punitive damages. In light of the lack of further proof, the Court will award a small amount of $10,000 in punitive damages.

In total, the Coder Family is entitled to $691,186.16 in damages, including the damages for the intentional misrepresentation claim, punitive damages, and attorney's fees.

## CONCLUSION

I THEREFORE ORDER the clerk of the Court to enter an amended judgment in favor of plaintiff Douglas Coder & Linda Coder Family LLLP and against Defendants RNO Exhibitions LLC and Vincent Webb, as outlined above.

IT IS SO ORDERED

Dated: February 16, 2023

_____
ROBERT C. JONES
United States District Judge